655 A.2d 417

TURF LAWNMOWER REPAIR, INC., A NEW JERSEY CORPORA-
TION AND JOHN L. GLORIA, PLAINTIFFS–APPELLANTS, v.
BERGEN RECORD CORPORATION, BRUCE LOCKLIN, MARY
ANNE DE MARCO, DAVID HALL, AND BYRON CAMPBELL,
DEFENDANTS–RESPONDENTS, AND EDWARD MITCHELL,
D/B/A EDDIE'S POWER EQUIPMENT, MARK WINNERS, ROB-
ERT VROEGINDAY, DOUGLAS LIVINGSTON, JOHN DOE AND
RICHARD ROE, INC., DEFENDANTS.

Argued October 24, 1994—Decided March 15, 1995.

*Richard E. Brennan* argued the cause for appellants (*Shanley & Fisher* and *Mark P. Denbeaux,* attorneys; *Mr. Brennan, Mr. Denbeaux,* and *Joseph M. Cerra,* on the briefs).

*Peter G. Banta* argued the cause for respondents (*Winne, Banta, Rizzi, Hetherington & Basralian,* attorneys; *Donald A. Klein* and *Craig L. Levinsohn,* on the brief).

*Thomas J. Cafferty* argued the cause for *amicus curiae*, New Jersey Press Association (*McGimpsey & Cafferty*, attorneys; *Mr. Cafferty* and *Arlene M. Turinchak*, on the brief).

The opinion of the Court was delivered by GARIBALDI, J.

This defamation appeal involves two newspaper articles that accused plaintiffs, Turf Lawnmower Repair, Inc., (Turf) and its owner and president, John L. Gloria, of deceptive business practices that "ripped off" customers. In this appeal we determine whether actual malice is the appropriate standard for all businesses, or whether negligence is the more appropriate standard of proof in defamation actions that involve businesses whose activities do not concern matters of public health or safety, do not constitute consumer fraud, or whose businesses are not subject to substantial government regulations.

# I

On Sunday, August 21, 1988, *The Record* published a special report by its Special Investigative News Editor and staff writer, Bruce Locklin, entitled, "A clip joint for lawn mowers, Tests, ex-workers reveal Teaneck shop deceives, overcharges." A sub-article entitled "Looking for honesty with a faulty machine" accompanied the lead article.

The lead article's author was Locklin, who characterized Gloria, the owner of Turf Lawn Mower Repair, as "fiercely ambitious." "[H]e set out to become a millionaire by age 30 and later run for Congress." Locklin also reported that Gloria, then age twenty-nine, had made his first million. · Locklin then wrote:

> But his success is flawed. Though his shop did about 12,000 repair jobs in the past three years, former employees estimate that 60 percent to 80 percent were rip-offs.
>
> Most customers who paid for tune-ups got little more than an oil change and a new spark plug—for which they typically were overcharged $20 to $30. Some paid for new parts and got used parts from junked mowers. Many were charged for repair work that was never done.

Independent tests conducted by The Record produced similar results. Reporters brought in mowers in need of simple repairs. Each time, Turf recommended or performed unnecessary work.

Locklin continued, quoting former customers, former employees, and a competitor:

There's a pervasive rudeness at Turf, where employees often add insult to injury. One customer, Andrea Daglezt of Bogota, said the man behind the counter talked to her as if she were an idiot. "That guy almost had my fist down his throat," she said. "He was so nasty...."

Winners is a former Turf mechanic who stayed on for about a year after Gloria became boss.

"When he worked for Bob, he was a nice guy. As soon as he took over, everything changed," Winners said. "I ended up quitting because ... I was tired of customers getting ripped off."

Winners said Gloria made bogus tuneups standard procedure. No longer did mechanics routinely install new points and condensers or rebuild carburetors by replacing worn parts.

Instead, the mowers got nothing more than fresh oil, a spark plug, and a quick cleanup. Labor time dropped from 30 or 40 minutes per mower to about 5 minutes.

Three other former mechanics, who each worked at Turf for about two years during the 1980–86 period, said they had the same instructions: Do the fake tuneups—but at full tuneup prices.

Mowers often broke down later in the season, the mechanics said, generating more repair work and opportunities to sell new mowers.

Bob Vroeninday, 27, now an auto mechanic in Ridgefield Park, said that when he was working for Turf in 1982 and 1983, Gloria used parts from junked mowers for repair work—without telling customers.

"On a cracked flywheel, he'd use an old one and charge you for a new one because that stuff you can't see," Vroeninday said.

Winners and Vroeninday said Gloria often lied to customers who brought in mowers that had jammed after hitting something solid. He would say the mower's crankshaft needed to be straightened when, in fact, the machine needed only a small part called a keyway. Its price? About $1.

"A job that should have cost $20 would cost about $90," Vroeninday said.

If a customer spotted a rip-off and complained, Gloria blamed his workers.

Doug Livingston, a Turf mechanic from 1984 to 1986, recalled how Gloria tried to make him the scapegoat to appease an angry customer. "He immediately turned around and pointed at me and said, 'This is the guy who worked on it. It's not my fault he didn't do his job.'"

Livingston, who now works at a Fair Lawn shop, said Gloria sometimes got vindictive if a customer became impatient. "He would get mad at him and just kick the machine in the back and say, 'Don't touch that for a week.'"

One customer got sick of being told "we're working on it" for more than a month. Ron Broking, who owns Ronnie's Restaurant in Palisades Park, went around back and found his mower untouched.

"It never, never got looked at," Broking said. "That's what burned me up because it was a lie." Broking packed his mower in his car and took it to another shop. Mel Clansky of New Milford had a tougher time of it. He paid Turf $54 to fix his electric mower. But when he took it home, it still didn't work. Clansky took it back to Turf and, while waiting, bought a new machine for $150. Turf called and wanted $200 to repair the old machine.

Clansky just wanted the mower returned, but Turf couldn't find it. He gave up in disgust.

"I wasn't going to bother taking the time off to go to small claims court," Clansky said. "It was unbelievable."

After these lengthy assertions, Locklin commented on *The Record*'s tests:

[T]ests conducted by The Record produced evidence of systematic rip-offs at Turf. Reporters took mowers there three times. Turf employees misdiagnosed problems, recommended work that wasn't needed and charged for work that wasn't done. . . .

The Record's tests at Turf started in June with a Lawnboy machine that needed carburetor repair. Turf kept the machine three weeks, charged a $20 diagnostic fee, and said it couldn't be fixed.

A Turf salesman offered to take the $20 off the price of a new mower, saying that even the manufacturer couldn't fix the Lawnboy. He pointed to Turf's standard tuneup price and said, "We could have got you for $50 or $60."

A reporter took the mower to a Lawnboy dealer in Nanuet, N.Y., where it was repaired and tuned up. Later, a second reporter took the same machine back to Turf. This time the spark plug clamp had been disconnected, and the reporter said she couldn't get the machine started.

Turf kept the machine another three weeks, charged a $20 diagnostic fee, and recommended an unnecessary $60 tuneup.

In the third test, a reporter took a Bobcat mower in good working condition to Turf. Again, the spark plug clamp was pulled loose so the machine wouldn't start. Turf kept the machine four weeks and charged $63 for a tuneup. A Turf mechanic said he rebuilt the carburetor and installed new points. But the mower has a solid-state ignition: It has no points.

Earlier in the article, Locklin described Gloria's response when Gloria agreed to an interview with him and his investigative researcher, Mary DeMarco. When Gloria was told about the results of *The Record* tests, Locklin wrote Gloria confessed that "his quality controls slipped this year because he was heavily involved in other investments and politics." Locklin quoted Gloria

as saying: " 'I had my fingers in so many pots that they were getting burned.' " Locklin had referred to Gloria's potential involvement in "revolutionizing" the lawn mower repair industry earlier in the article.

In addition to detailing Gloria's political work for then-presidential candidate Jack Kemp, Locklin also highlighted earlier in the article some inspirational elements of Gloria's success story.

> His father is a postman, and his mother is a waitress. He grew up in New Milford, a few blocks from the [Turf] mower shop. He got a job there when he was 14. By the time he graduated from Ramapo College at age 20, he was managing the place. Gloria had planned to go to law school, but Bob Engel, the mower shop owner, offered to sell the business. Gloria went for it.

At the beginning of the article, Locklin emphasized the Small Business Administration's selection of Gloria as New Jersey's young entrepreneur of 1986.

In a sub-article, Locklin explained his method, logic, and results of the loose-spark-plug test conducted at Turf and at eleven other shops on one occasion. Of the twelve, six shops identified the rigged problem, Turf and five other shops did not. Locklin characterized the test as "Bozo-with-a-mower." In that sub-article Locklin concluded:

> A reporter took the same machine to Turf Lawn Mower Repair in Teaneck and told the same story. Turf said the mower probably needed a tuneup. The reporter left the mower. Four weeks later, the mower was ready, its spark plug cap in place. The bill was $63.

## II

On January 10, 1989, on his own behalf and on behalf of Turf, Gloria, acting as president and sole stockholder of Turf, filed a three-count complaint against The Bergen Record Corporation, which publishes *The Record* and *The Sunday Record* newspapers; David Hall, editor; Byron Campbell, publisher; Bruce Locklin, Investigative News Editor; and Mary Anne DeMarco, investigative researcher. In that complaint plaintiffs alleged that defendants had maliciously published a news article about plaintiffs (count one—libel); that Mark Winners, Robert Vroeginday, and Douglas Livingston (Turf's former employees) had given false and

malicious statements to defendants to injure plaintiffs' good name (count two—slander); and that because of the tortious conduct of defendants and former Turf employees, plaintiffs had suffered the loss of prospective customers and income and Gloria had suffered mental anxiety, emotional distress, and embarrassment (count three—intentional interference with prospective business advantage). In August of 1990, plaintiffs also filed a complaint against a competitor in the business, Edward Mitchell doing business as Eddie's Power Equipment (Mitchell), claiming that Mitchell had cooperated with Locklin in gathering information that had appeared in *The Record* article to destroy plaintiffs' business. All claims against the former Turf employees were dismissed later by consent.

After extensive discovery, defendants and Mitchell moved for summary judgment, which the trial court granted. Mitchell's motion is not before us. In granting defendants' motion, the trial court held:

> For the purposes of summary judgment, this court accepts plaintiff's version of any contradicted facts. This court accepts that in retrospect the tests were unfair, the informants biased, and the questions loaded. Nevertheless, the comments of each individual to Bruce Locklin were highly detailed and cumulatively very similar. There was no allegation of deliberate knowledge of falsehood but of reckless disregard.

The trial court applied the actual-malice standard because plaintiffs had conceded its applicability. Although concluding that plaintiffs had failed to establish actual malice, the trial court stated:

> Here, although the methods employed may have been negligent or even grossly negligent, the notes and interviews of Locklin are sufficiently detailed and cumulatively are specific and corroborative.

> This court is mindful of the article's detrimental impact on plaintiff. Viewed from the perspective of the justice system, plaintiff did not get a fair trial before the verdict of Locklin was published in The Record. Yet, this court must be mindful of the importance of a free press to our society and the reasons underlying the tremendously difficult standard imposed by our Supreme Court in defamation cases.

> Plaintiff fails to raise a genuine issue of actual malice and summary judgment is granted.

The Appellate Division affirmed the trial court's grant of summary judgment to defendants. 269 *N.J.Super.* 370, 635 *A.*2d 575 (1994). A majority of that court found that the sale and repair of lawn mowers is "a subject of legitimate public interest." *Id.* at 376, 635 *A.*2d 575. The court found no difference between a business that provides goods and one that provides services. *Ibid.* The concurring judge affirmed the trial court because she concluded, as had the trial court, that plaintiffs had conceded the applicability of the actual-malice standard. Thus, the concurring judge found it "unnecessary to decide whether [petitioners'] business involving the sale and repair of lawn mowers is a matter of legitimate public interest." *Id.* at 380, 635 *A.*2d 575. (Wefing, J.A.D., t/a, concurring). We granted plaintiffs' petition for certification. 136 *N.J.* 30, 641 *A.*2d 1041 (1994).

## III

■ We first address whether actual malice is the appropriate standard of proof in defamation actions involving any business whose activities are the subject of a newspaper article. The majority of the Appellate Division held that the actual-malice standard applies because "any person or business which opens itself to the general public thereby subjects itself to the scrutiny that naturally comes with the attention it seeks, and thus creates a subject of legitimate public interest." 269 *N.J.Super.* at 376, 635 *A.*2d 575. Plaintiffs contend, however, that the imposition of the actual-malice standard of liability is inappropriate. To subject the local shoemaker, corner newspaper stand owner, and other similarly situated business owners to such a heightened standard of proof places an impossible burden on them. Most local businesses and their owners do not voluntarily thrust themselves into public controversy merely by opening a business. Nor do they have the prominence or financial ability to present their cases effectively to the public if unfairly or falsely attacked by the media. Defendants, however, contend that imposition of the actual-malice standard is needed to protect the free flow of information.

An examination of the law of defamation discloses that such a broad privilege is unnecessary and strikes an improper balance between the public's interest in preserving an uninhibited, robust, and free press and in protecting the good name and reputation of a business and its owner. Reviewing the public-policy considerations behind the actual-malice standard demonstrates that courts should not impose it on every business. Nor will the failure to apply the higher standard of actual malice on such businesses have a chilling effect on the press.

For years most state defamation laws gave redress to a defamed private person for proving only that a false publication subjected "him to hatred, contempt, or ridicule." *See Gertz v. Welch, Inc.* 418 *U.S.* 323, 370, 94 *S.Ct.* 2997, 3022, 41 *L.Ed.*2d 789, 822 (1974) (White, J., dissenting). In *New York Times Co. v. Sullivan, (New York Times* ), however, the United States Supreme Court placed limits on state defamation law and developed the actual-malice standard for recovery by public officials. 376 *U.S.* 254, 279–280, 84 *S.Ct.* 710, 725–726, 11 *L.Ed.*2d 686, 706 (1964). Extending that standard to public figures three years later, the Court in *Curtis Publishing Co. v. Butts* also extended the privilege to defendants who write or report on non-public or private persons who "are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large," 388 *U.S.* 130, 164, 87 *S.Ct.* 1975, 1996, 18 *L.Ed.*2d 1094, 1116 (1967) (Warren, C.J., concurring). Hence, the genesis of "public concern" in First Amendment law.

In *Rosenbloom v. Metromedia, Inc.,* 403 *U.S.* 29, 91 *S.Ct.* 1811, 29 *L.Ed.*2d 296 (1971), a plurality of the Court further extended the *New York Times* standard to all libel actions, regardless of a plaintiff's status, so long as the defamatory statement relates to matters of "public or general interest." Three years later, the Court, realizing that it had extended the requirement of actual malice too far, repudiated *Rosenbloom* 's "public or general interest test" for private persons. *Gertz, supra,* 418 *U.S.* at 346, 94

*S.Ct.* at 3010, 41 *L.Ed.*2d at 809. The Supreme Court recognized that because private persons lack "access to the channels of effective communication ... to counteract false statements" and because they have "relinquished no part of [their] good name[s]" by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," private persons are entitled to greater protection than public persons. *Id.* at 344–45, 94 *S.Ct.* at 3009, 41 *L.Ed.*2d at 808.

The Court concluded that "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." *Id.* at 343, 94 *S.Ct.* at 3008–3009, 41 *L.Ed.*2d at 807. Thus, *Gertz* made it clear that the federal constitution does not require "private persons" to demonstrate actual malice before they can prevail in a defamation suit against a media defendant even if the matter is one of legitimate public concern. Nevertheless, *Gertz* continued to allow each state to define its own appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private person. *Id.* at 347, 94 *S.Ct.* at 3010–3011, 41 *L.Ed.*2d at 809.

However, the *Gertz* Court did provide certain safeguards for the press. First, the Court held that a state could not impose liability without requiring some showing of fault. *Ibid.* Second, the Court held that a state could not permit recovery of presumed or punitive damages on a showing of less than actual malice. *Id.* at 349, 94 *S.Ct.* at 3011–3012, 41 *L.Ed.*2d at 810. The Court later imposed on private-figure plaintiffs "the burden of showing falsity as well as fault before recovering damages." *Philadelphia Newspapers, Inc. v. Hepps,* 475 *U.S.* 767, 776, 106 *S.Ct.* 1558, 1563, 89 *L.Ed.*2d 783, 792 (1986). Moreover, as an additional protection " 'in cases raising First Amendment issues ... appellate court[s] must ... make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Milkovich v. Lorain J. Co.,* 497 *U.S.* 1, 17, 110 *S.Ct.* 2695, 2705, 111 *L.Ed.*2d 1,

17 (1990) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 *U.S.* 485, 499, 104 *S.Ct.* 1949, 1958, 80 *L.Ed.*2d 502, 515 (1984) (quoting *New York Times, supra,* 376 *U.S.* at 284–86, 84 *S.Ct.* at 728, 11 *L.Ed.*2d at 709) (omission in original)).   The Court also recognized that ample constitutional safeguards protect the press adequately, and therefore concluded that establishing another First Amendment protection for defamatory statements made by the media was unnecessary. *Id.* at 19, 110 *S.Ct.* at 2706, 111 *L.Ed.*2d at 18 (holding that statements categorized as "opinion" as opposed to "fact" are not exempt from defamation claim).

## IV

Although each state might formulate slight variations, forty-two jurisdictions in the United States [1] hold that negligence is the

[1] The negligence standard prevails in thirty-eight states, the District of Columbia, and three other United States jurisdictions. *Mead Corp. v. Hicks,* 448 *So.*2d 308 (D.Ala.1983); *Sisemore v. U.S. News & World Report, Inc.,* 662 *F.Supp.* 1529, 1535 (D.Alaska 1987) (court presumed that the Alaska Supreme Court would now follow the rule that is "apparently sound and increasingly dominant in other jurisdictions" that actual malice does not apply to comment on matters of public concern unless plaintiff is a public figure, and the Alaska Supreme Court followed District Court's lead in *Moffatt v. Brown,* 751 *P.*2d 939 (1988) in effect overruling *Gay v. Williams,* 486 *F.Supp.* 12 (D.Alaska 1979)); *Peagler v. Phoenix News., Inc.,* 114 *Ariz.* 309, 560 *P.*2d 1216 (1977); *Dodrill v. Arkansas Democrat Co.,* 590 *S.W.*2d 840 (1979), *cert. denied,* 100 *S.Ct.* 1024 (1980), 281 *Ark.* 25, 660 *S.W.*2d 933 (1983); *Brown v. Kelly Broadcasting Co.,* 48 *Cal.*3d 711, 257 *Cal.Rptr.* 708, 771 *P.*2d 406 (1989); *Miles v. Perry,* 11 *Conn.App.* 584, 529 *A.*2d 199 (1987); *Re v. Gannett Co. In.* 480 *A.*2d 662 (Del.1984), *aff'd* 496 *A.*2d 553 (Del.1985); *Phillips v. Evening Star News. Co.,* 424 *A.*2d 78 (D.C.App.1980), *cert. denied,* 451 *U.S.* 989, 101 *S.Ct.* 2327, 68 *L.Ed.*2d 848 (1981); *Miami Herald Publishing Co. v. Ane,* 458 *So.*2d 239 (Fla.1984); *Triangle Publications v. Chumley,* 253 *Ga.* 179, 317 *S.E.*2d 534 (1984); *Porter v. Guam Publications, Inc.,* 643 *F.*2d 615 (9th Cir. interpreting law of Guam) *cert. denied* 454 *U.S.* 940, 102 *S.Ct.* 475, 70 *L.Ed.*2d 247 (1981); *Cahill v. Hawaiian Paradise Park Corp.,* 56 *Haw.* 522, 543 *P.*2d 1356 (1975); *Wiemer v. Rankin,* 117 *Idaho* 566, 790 *P.*2d 347 (1990); *Rosner v. Field Enter., Inc.,* 205 *Ill.App.*3d 769, 151 *Ill.Dec.* 154, 564 *N.E.*2d 131 (1990) (held actual malice standard does not apply to action by private individual, a podiatrist, against media defendants, even though series of articles on accident and medical insurance fraud involved matter of public concern or general interest); *Gobin v. Globe Publishing Co.,* 216 *Kan.* 223, 531 *P.*2d 76 (1975); *McCall v. Courier–Journal & Louisville Times Co.,* 623 *S.W.*2d

standard for private plaintiffs to recover against a media defendant even when the subject matter of the speech is of public

882 (Ky.1981), *cert. denied* 456 *U.S.* 975, 102 *S.Ct.* 2239, 72 *L.Ed.*2d 849 (1982); *Wilson v. Capital City Press*, 315 *So.*2d 393 (La.Ct.App.), *cert. denied*, 320 *So.*2d 203 (1975); *General Motors Corp. v. Piskor*, 277 *Md.* 165, 352 *A.*2d 810 (1976); *Stone v. Essex Cty. News.*, 367 *Mass.* 849, 330 *N.E.*2d 161 (1975); *Rouch v. Enquirer & News of Battle Creek*, 427 *Mich.* 157, 398 *N.W.*2d 245 (1986); *Jadwin v. Minneapolis Star and Tribune Co.*, 367 *N.W.*2d 476 (Minn.1985); *Newson v. Henry*, 443 *So.*2d 817 (Miss.1984); *McCusker v. Valley News*, 121 *N.H.* 258, 428 *A.*2d 493 (1981); *Marchiondo v. Brown*, 98 *N.M.* 394, 649 *P.*2d 462 (1982); *Walters v. Sanford Herald*, 31 *N.C.App.* 233, 228 *S.E.*2d 766 (1976); *Landsdowne v. Beacon J. Publishing Co.*, 32 *Ohio St.*3d 176, 512 *N.E.*2d 979 (1987); *Martin v. Griffin Tele., Inc.*, 549 *P.*2d 85 (Okla.1976); *Bank of Or. v. Independent News*, 65 *Or.App.* 29, 670 *P.*2d 616 (1983); *Mathis v. Phila. News.*, 455 *F.Supp.* 406 (E.D.Pa.1978); *Torres–Silva v. El Mundo*, 106 *P.R.Dec.* 15 (P.R.1977); *De Carvalho v. Da Silva*, 414 *A.*2d 806 (R.I.1980); *Jones v. Sun Publishing Co.*, 278 *S.C.* 12, 292 *S.E.*2d 23, *cert. denied* 459 *U.S.* 944, 103 *S.Ct.* 258, 74 *L.Ed.*2d 201 (1982); *Memphis Publishing Co. v. Nichols*, 569 *S.W.*2d 412 (Tenn.1978); *Foster v. Laredo News., Inc.*, 541 *S.W.*2d 809 (Tex.1976), *cert. denied* 429 *U.S.* 1123, 97 *S.Ct.* 1160, 57 *L.Ed.*2d 573 (1977); *Seegmiller v. K.S.L., Inc.*, 626 *P.*2d 968 (Utah 1981); *Colombo v. Times–Argus Ass'n*, 135 *Vt.* 454, 380 *A.*2d 80 (1977); *Gazette, Inc. v. Harris*, 229 *Va.* 1, 325 *S.E.*2d 713 (1985); *Ali v. Daily News Publishing Co.*, 540 *F.Supp.* 142 (V.I.1982); *Caruso v. Local Union No. 690*, 100 *Wash.*2d 343, 670 *P.*2d 240 (1983); *Crump v. Beckley News., Inc.*, 173 *W.Va.* 699, 320 *S.E.*2d 70 (1984); *Denny v. Mertz*, 106 *Wis.*2d 636, 318 *N.W.*2d 141 *cert. denied* 459 *U.S.* 883, 103 *S.Ct.* 179, 74 *L.Ed.*2d 147 (1982); *Adams v. Frontier Broadcasting Co.*, 555 *P.*2d 556 (Wyo.1976).

In addition, seven United States jurisdictions have not considered this issue. However, four of those jurisdictions have adopted an actual-malice standard applicable only to a public official and a matter of public concern that signals that the standard of actual malice would not be adopted when a private person is involved. *See Nazieri v. Miss. Valley College*, 860 *S.W.*2d 303, 314 (Mo.1993) (en banc); *Hoch v. Prokop*, 244 *Neb.* 443, 507 *N.W.*2d 626, 629 (1993); *Nev. Ind. Broadcasting Corp. v. Allen*, 99 *Nev.* 404, 664 *P.*2d 337, 344 (1983); *Nelson v. Web Water Devel. Ass'n, Inc.*, 507 *N.W.*2d 691, 697 (S.D.1993); and *see also Lence v. Hagadone Inv. Co.*, 258 *Mont.* 433, 853 *P.*2d 1230, 1237 (1993) (in deciding emotional distress claims arising from a libel suit, court distinguished plaintiff as a "private person", rather than "a public figure subject to an 'actual malice' standard").

The New York courts have adopted an intermediate "gross irresponsibility" standard. *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 *N.Y.*2d 196, 379 *N.Y.S.*2d 61, 341 *N.E.*2d 569 (1975); *Gaeta v. N.Y. Times, Inc.*, 62 *N.Y.*2d 340, 477 *N.Y.S.*2d 82, 465 *N.E.*2d 802 (1984).

concern. That choice of standard is significant because it supports our finding that the failure to impose the actual-malice standard in every defamation action involving a business product or service will not have a chilling effect on the press. Neither *amicus curiae*, the New Jersey Press Association, nor defendants have presented any evidence to the contrary.

Given the size and variety of the foregoing authority, we are unable to delineate each state's nuances in imposing such a negligence standard. However, we discuss the standard in California because its seminal case is so factually similar to this case. In *Brown v. Kelly Broadcasting Co.,* 48 *Cal.*3d 711, 257 *Cal.Rptr.* 708, 736–737, 771 *P.*2d 406, 435 (1989), the California Supreme Court held that a state statute did not contain a broad public-interest privilege for the television station that had televised consumer affairs' reports critical of a local home contractor. To mend the damage to her professional reputation, the contractor sought a retraction from the broadcasting company and an investigation from the Contractor's State License Board. *Id.* 257 *Cal. Rptr.* at 711, 771 *P.*2d at 409. The broadcasting company refused to retract the allegations made by the homeowner on its televised programs and claimed that it had given the contractor an opportunity to defend herself on its second broadcast, but she had refused to do so. *Ibid.* The Contractor's State License Board refused to undertake an investigation to help the contractor because it found no factual support for the homeowner's televised allegations against the contractor. *Ibid.* At trial, the broadcasting company won summary judgment by claiming that it enjoyed a privilege under the California statute as well as federal law, which allowed it to publish any story in the public interest about a private person, regardless of its libelous or slanderous effects, so long as it did not do so with malice. *Id.* at 711–12, 771 *P.*2d at 409–10. The California Court of Appeals affirmed this privilege, but found sufficient evidence to question whether the broadcasting company had acted with malice. *Id.* at 711, 771 *P.*2d at 410.

Relying on its own statutory interpretation and law developed by the United States Supreme Court, the California Supreme

Court rejected the privilege sought by the media. The *Brown* court also noted the following public policy considerations underlying its decision. First, it found that "the breadth of the privilege sought by defendants is difficult to overstate." *Id.* at 725, 771 *P.*2d at 423. It "would be so broad that it would apply to almost every defamatory communication . . . [so that] the media in every defamation action would . . . argue that the communication was a matter of public interest." *Id.* at 715, 725, 771 *P.*2d at 413, 423. Second, noting the overwhelming weight of authority from other states and the *Restatement (Second) of Torts,* § 580B (1989), which adopted the negligence standard, the *Brown* court saw no reason to "deny California citizens protection for their reputation equal to that provided in other states." *Id.* at 727, 771 *P.*2d at 425. Third, the court recognized the importance of a private person's reputation, and remembered that " 'the defamation action, properly limited, also plays an important role in a free society as it represents the individual's sole remedy against the occasional excesses of the print and electronic media which often have vast resources to inflict untoward damage upon an individual.' " *Ibid.* (quoting *Miami Herald* [*Publishing Co. v. Ane*], *supra,* 423 *So.*2d [376] at 387 [ (Fla.App.1982) ] ). Fourth, the *Brown* court recognized the substantial constitutional protections that exist for the news media. *Id.* 257 *Cal.Rptr.* at 730–31, 771 *P.*2d at 428–29. Fifth, the court saw no need to expand the privilege of the media because the negligence standard is not a standard of strict liability, and a journalist need act only with reasonable care to avoid liability under a negligence standard. *Id.* at 732, 771 *P.*2d at 430. Sixth, the defendant did not show that the "free flow of information has been restricted even in the slightest degree in the overwhelming number of states that has adopted a negligence standard." *Ibid.* Finally, the press can always correct its error. *Id.* at 733, 771 *P.*2d at 431. For all those reasons, the California Supreme Court found the negligence standard is appropriate for private plaintiffs who have been defamed through a story that the media considers of public concern. *Id.* at 725, 771 *P.*2d at 423.

Currently, only three jurisdictions use the actual-malice standard in defamation actions brought by private persons: Colorado, Indiana, and our own state. Commentators explain those three deviations from the majority of states as acceptance of Justice Brennan's reasoning in *Rosenbloom, supra,* that the public nature of the disputed statement, rather than the public status of the plaintiff, should trigger the standard of actual malice. Ronald Smolla, *Law of Defamation,* 3–28 (1988). However, as we previously explained, that reasoning has been repudiated by the Supreme Court in *Gertz* and is not followed in most states. Indeed, federal courts have cast doubt on the wisdom in both Colorado and Indiana of applying the actual-malice standard so broadly. *See Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 *F.*2d 511, 526–29 (10th Cir.1987) (quoting *Kuhn v. Tribune–Republican Publishing Co.,* 637 *P.*2d 315, 319 (Colo.1981)) (hinting that the Colorado Supreme Court has misplaced the actual-malice standard developed for " 'good faith critics of public officials' "); *see supra* note 1 (noting that federal court convinced the Alaska Supreme Court to lower its standard to negligence).

Judges in both Indiana state and federal courts have noted the lack of acceptance of Indiana's standard and reasoning but have refused to abandon the standard because the Supreme Court of Indiana has not expressed disapproval of it. *Jean v. Dugan,* 20 *F.*3d 255, 262 (7th Cir.1994); *Chang v. Michiana Telecasting Corp.,* 900 *F.*2d 1085, 1087–88 (7th Cir.1990).

## V

The law of New Jersey parallels the complex, yet ever-changing, law of defamation in both federal and other state courts. As we have stated previously, "The evolution of the law of defamation reflects the tension between society's competing interests in encouraging the free flow of information about matters of public concern and in protecting an individual's reputation." *Dairy Stores, Inc. v. Sentinel Publishing Co.,* 104 *N.J.* 125, 135–36, 516 *A.*2d 220 (1986).

We are committed to the principle that debate on public issues should be uninhibited, robust, and wide open. *Sisler v. Gannett Co.*, 104 *N.J.* 256, 266, 516 *A.*2d 1083 (1986); *see Dairy Stores, supra*, 104 *N.J.* at 138, 516 *A.*2d 220. However, we have also recognized that " '[t]he law of defamation embodies the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks.' " *Costello v. Ocean County Observer*, 136 *N.J.* 594, 606, 643 *A.*2d 1012 (1994) (quoting *Swede v. Passaic Daily News*, 30 *N.J.* 320, 331, 153 *A.*2d 36 (1959)).

To balance these public policy considerations, the jurisprudence developed by this Court has followed the United States Supreme Court's delineation of the class of defamation plaintiffs into public or private figures. In *Sisler, supra*, we termed this balancing test one between the "warring interests of free speech and individual reputation." 104 *N.J.* at 265, 516 *A.*2d 1083. As in many federal cases since *Gertz*, the designation of an individual plaintiff as a public or private figure became the critical determination in many defamation actions. *E.g., Costello, supra*, 136 *N.J.* at 612–14, 643 *A.*2d 1012; *Sisler, supra*, 104 *N.J.* at 269–70, 516 *A.*2d 1083. Underlying that focus was "the idea that individuals who have knowingly and voluntarily exposed themselves to public commentary can more fairly be required to shoulder a heavier burden of proof in order to establish actionable defamation." *Sisler, supra*, 104 *N.J.* at 265, 516 *A.*2d 1083.

After *Gertz*, the Supreme Court noted that the type of speech does have relevance, for it is speech on matters of public concern that is at the heart of the First Amendment's protection. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 *U.S.* 749, 758–59, 105 *S.Ct.* 2939, 2944–45, 86 *L.Ed.*2d 593, 602–03 (1985). Thus, to accompany our delineation of defamation plaintiffs, this Court also developed a classification for the subject matter of the speech involved based on public policy considerations. That classification for defamation actions is the heart of the controversy before us. Following *New York Times, supra*, we sought to protect speech

that relates to a matter of legitimate public concern because of " 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' " *Kotlikoff v. The Community News*, 89 *N.J.* 62, 73, 444 *A.*2d 1086 (1982) (quoting *New York Times, supra*, 376 *U.S.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701). However, we also found speech not pertaining to matters of public concern as resting "more lightly on the free speech/reputation interest scale." *Sisler, supra*, 104 *N.J.* at 266, 516 *A.*2d 1083.

In *Dairy Stores* and *Sisler*, we constructed a test to reflect public policy considerations often ignored in other states. *See* 104 *N.J.* at 141–46, 516 *A.*2d 220; 104 *N.J.* at 279, 516 *A.*2d 1083. In those cases we sought to protect speech that affects the health and safety of the citizenry, or involves a highly regulated industry. However, a close reading of *Dairy Stores* and *Sisler* discloses that we never intended to extend the heightened standard of actual malice to all consumer investigative reporting. In *Dairy Stores*, we extended the heightened standard of proof only to defamatory communications regarding activities that affect the *public interest*. The Court recognized

> that not everything that is newsworthy is a matter of legitimate public concern, and that sorting such matters from those of a more private nature may be difficult....
>
> Some courts have developed criteria for determining whether the activities and products of corporations constitute matters of public interest. As previously indicated, matters of public interest include such essentials of life as food and water. Widespread effects of a product are yet another indicator that statements about the product are in the public interest. Still another criterion is substantial government regulations of business activities and products.
>
> [*Id.* at 144–45, 516 *A.*2d 220 (citations omitted).]

Because the bottling and selling of drinking water was regulated by the State of New Jersey and drinking water was an essential of life, we held in *Dairy Stores* that the subject matter of the newspapers' articles, drinking water, was a legitimate concern of the public because of the long history of this state's regulation in that area. *Id.* at 145, 516 *A.*2d 220. However, this Court correctly reserved for another day the task of developing "a more complete definition of legitimate concerns of the public." *Ibid.*

Nor does *Sisler* support defendants' position. *Sisler* involved a retired banker who had loans from a bank of which he had been the founder and former president. A newspaper published a story asserting that the banker had received under collateralized loans from the bank to finance his horse farm. Suing in defamation, the banker argued that he was a private person and that an ordinary-negligence standard governed. Employing a negligence standard, a jury returned a substantial verdict in his favor. Although we agreed that the plaintiff was neither a public figure nor a limited public figure, we nonetheless vacated the award, holding that an actual-malice standard should govern. We reasoned:

> Plaintiff founded [the bank], and served as its President and Director for almost twenty years. He was therefore undoubtedly thoroughly and intimately conversant with all of the public and governmental interests that attend the banking industry. Plaintiff would know of course that banks are regularly examined and audited. Moreover, the transaction itself was fraught with public implications. Plaintiff received a large loan from [the bank], secured by a mortgage; this occurred shortly after his retirement from official bank positions. Most people in the business and commercial world would expect that a large loan between a bank and its founder and former president would attract special scrutiny and examination. *See N.J.S.A.* 17:9A–72 (special guidelines for loans to bank directors or executive officers).
>
> [104 *N.J.* at 275, 516 *A.2d* 1083.]

Based on this factual scenario, we held that:

> when a private person with sufficient experience, understanding and knowledge enters into a personal transaction or conducts his personal affairs in a manner that one in his position would reasonably expect implicates a legitimate public interest with an attendant risk of publicity, defamatory speech that focuses upon that public interest will not be actionable unless it has been published with actual malice.
>
> [*Id.* at 279, 516 *A.2d* 1083.]

However, we noted that

> our precedents have not totally subjugated the individual's interest in the name of free speech. For instance, the fair comment privilege, which at common law protected opinion on topics of public concern, also took into account individual fairness. Implicit in the determination of what was a matter of legitimate public concern for purposes of accrual of the fair comment privilege was a fairness assessment based on the voluntariness or expectation of exposure and publicity.
>
> [*Id.* at 272, 516 *A.2d* 1083.]

Both *Dairy Stores* and *Sisler* involved business activities that intrinsically implicated important public interests, a matter of

public health—the sale of such an essential of life as bottled water—and an industry heavily regulated by the government—banks. We continue to apply the actual-malice standard to businesses that are of such inherent public concern. However, we do not find the actual-malice standard appropriate or necessary with regard to businesses like the sale and repair of lawn mowers, the repair of shoes, the cleaning of clothes, and numerous other local businesses that involve everyday products or services that do not intrinsically involve a legitimate public interest.

Like federal law and the vast majority of state law, the defamation law of our state holds the media responsible for libelous or defamatory statements about private citizens. Statements made by the media about public figures are treated differently from those of private citizens. Private persons are defined by their failure to thrust themselves voluntarily into the public limelight and by their inability to respond to criticism of them in the media. We find most ordinary businesses and their owners are like private persons, and therefore, generally, the defamation rules we apply to private persons are equally applicable to them.

Many businesses are sole proprietorships or small individually-owned stores, like a local "mom and pop" stationery store, shoe-maker, tailor, cleaner, or barber. Although those stores are important in the daily life of their communities, their owners are not "public figures." Nor do their activities involve "matters of public concern" that the United States Supreme Court and the vast majority of federal and state courts have made subject to the heightened actual-malice standard of proof. Neither the public nor the owners of those ordinary businesses see the owners in the vortex of a public controversy by selling their product or service to the public. Nor does our opinion change because those businesses do limited advertising. Most businesses do advertise if only in a local shopping flyer, to attract customers and to succeed. Such advertising is insufficient to thrust the business or its owner into the public spotlight.

Moreover, most of those businesses and their owners have neither the financial resources nor "access to the channels of

effective communication ... to counteract false statements" to protect their business and their livelihood from a defamatory newspaper report. *Gertz, supra*, 418 *U.S.* at 344, 94 *S.Ct.* at 3009, 41 *L.Ed.*2d at 808. They are neither traditional "public figures" nor do they engage in activities that constitute traditional matters of public concern. Therefore, in respect of such prosaic and innocuous everyday businesses, we conclude that the negligence standard best balances the interests of the public in preserving an uninhibited, robust, and free press and the interests of a private individual and a business in preserving their reputation and good name.

The public does, however, have a legitimate interest in any business charged with criminal fraud, a substantial regulatory violation, or consumer fraud that raises a matter of legitimate public concern. When the media addresses those issues of legitimate and compelling public concern, the actual-malice standard of proof will apply, regardless of the type of business involved. In so ruling, we seek a balance between a private person's right of privacy and the public's right to know of various dangers in our society.

Here, we find that the sale and repair of lawn mowers is a business that normally would trigger the negligence standard. Certainly, the operations of a lawn-mower-repair shop are unregulated and do not impact on any of the "essentials of life." And the factors that motivated us in *Sisler* to apply the heightened-proof standard are plainly missing from this case. The simple business of lawn-mower repair is not imbued "with all of the public and governmental interests that attend the banking industry." *Sisler, supra*, 104 *N.J.* at 275, 516 *A.*2d 1083. In addition, lawn-mower-repair shops are not "regularly examined and audited" by any regulatory agency. *Ibid.* Accordingly, unless the acts alleged by *The Record* constitute consumer fraud that concern a matter of legitimate public interest, the negligence standard will apply.

## VI

The New Jersey Legislature has enacted a statute that aims to protect consumers from fraud in the sale or advertisement of merchandise, *New Jersey Consumer Fraud Act, N.J.S.A.* 56:8–1 to –48 (the Act). First enacted in 1960, the Legislature has frequently amended the statute to " 'give New Jersey one of the strongest consumer protection laws in the nation.' " *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 15, 647 *A.2d* 454 (1994) (quoting *Governor's Press Release for Assembly Bill No. 2402,* at 1 (Apr. 19, 1971)). The focus of the Act is the activity of a corporation that constitutes an "unlawful practice." For example, *N.J.S.A.* 56:8–2, dealing with fraud in connection with sale or advertisements by merchants, reads:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such ... whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....

"[T]he phrase 'unconscionable commercial practice' is not defined in the Act. Acknowledging that 'unconscionability' is an 'amorphous concept obviously designed to establish a broad business ethic,' we have defined the term as '[t]he standard of conduct contemplat[ing] * * * good faith, honesty in fact and observance of fair dealing.' " *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 472, 541 *A.2d* 1063 (1988) (quoting *Kugler v. Romain,* 58 *N.J.* 522, 544, 279 *A.2d* 640 (1971)).

In *Cox,* we also determined that to violate the Act a "person must commit an unlawful practice" under the Act which we found fell "into three general categories: affirmative acts, knowing omissions, and regulation violations." *Cox, supra,* 138 *N.J.* at 17, 647 *A.2d* 454. The "capacity to mislead, however, is the prime ingredient of all types of consumer fraud." *Ibid.*

*Hyland v. Zuback,* 146 *N.J.Super.* 407, 370 *A.2d* 20 (App.Div. 1976), presents an instructive example of consumer fraud. There, the owner of a small pleasure boat complained to the Attorney

General about the owner of a business who hauled, repaired, and stored motorboats. *Id.* at 409, 370 *A.*2d 20. The original agreement between the consumer and the business owner was for work on the boat that would cost $50 and would be finished within a few days. *Ibid.* Several weeks later, the business owner phoned the consumer and urged him to agree to replacement of an additional part. The consumer refused. At that time the business owner assured the consumer that "the job was progressing as planned ... [and] assured him that everything was fine and that he need not worry." *Id.* at 414, 370 *A.*2d 20. Over one month after the parties had contracted, the business owner presented the consumer with a bill for $468. The business owner had not consulted the consumer about the substantial increase. *Id.* at 412, 370 *A.*2d 20. At the time of pick-up, the business owner threatened the consumer that if he did not pay the increased bill, he would keep the boat in storage and continue to charge him for such storage. In addition to the increased cost, the consumer's complaint at the time of pick-up and payment was that a part specified to be fixed in the original contract had not been replaced. The business owner testified that the part did not need replacement. *Ibid.* The consumer later discovered that his boat was inoperable, and he spent an additional $300 and several months returning his boat to operating condition. *Id.* at 413, 370 *A.*2d 20.

The Appellate Division found the cost overrun an unconscionable practice that was an "act of a quality which the Legislature sought to suppress" in enacting *N.J.S.A.* 56:8–2. *Id.* at 414, 370 *A.*2d 20. Moreover, the business owner's "practice" of lulling the consumer into a false sense of security during the extended work with its increased cost as well as his practice of presenting the consumer with an ultimatum when the consumer went to retrieve his boat was more than "mere omission"; such practice constituted deception and misrepresentation. *Id.* at 415, 370 *A.*2d 20. *See also Levin v. Lewis,* 179 *N.J.Super.* 193, 431 *A.*2d 157 (App.Div. 1981) (finding violation of Consumer Fraud Act where two consumers each originally given a firm price for completion of work were subsequently billed more than twice the original price).

The series of business dealings in *Hyland* and *Levin* constituted consumer fraud. If the media publicized those activities, the actual-malice standard would apply, as it would for media coverage on highly regulated industries or businesses whose activities concern health and safety.

## VII

No hard and fast rules exist to determine whether alleged consumer fraud conduct reported in a newspaper article raises a matter of public concern sufficient to trigger the actual-malice standard. What constitutes consumer fraud depends not on the manner of investigation employed by the media to capture the story, but generally on whether the alleged activities of the business would constitute a cause of action under the Consumer Fraud Act. Moreover, the article must deal primarily with consumer fraud viewed as a whole in light of all surrounding circumstances. If the court determines that substantially all the allegations set forth in the article, if true, would support a consumer fraud complaint, then the actual-malice standard will apply.

The Act and our own jurisprudence provide a plethora of examples of what does or does not amount to consumer fraud. Mere puffery does not constitute consumer fraud. Nor does charging five or five-hundred dollars more for an item than the price charged by a nearby competitor amount to consumer fraud. Usually, consumer fraud involves a pattern of repetitive conduct, not separate incidents. Minor disagreements between consumer and business owner over quality of customer service, timing of service, or increased price is not consumer fraud. To constitute consumer fraud sufficient to trigger the actual-malice standard, the business practice in question must be "misleading" and stand outside the norm of reasonable business practice in that it will victimize the average consumer, and thus most clearly and directly involve a matter of legitimate public concern. The conduct of the

business owners in *Levin, supra,* 179 *N.J.Super.* 193, 431 *A.*2d 157 and *Hyland, supra,* 146 *N.J.Super.* at 409, 370 *A.*2d 20, *supra* at 413–415, 655 *A.*2d at 428–30, are examples of such egregious business practices.

Our standard recognizes a distinction between consumer fraud and mere customer dissatisfaction. We thereby seek to accommodate the need of the public to learn of highly suspect business practices that clearly implicate matters of public concern, and the vulnerable position of the business owner whose mechanic fixes three problems when a car has four problems, or whose sales assistant is grumpy and less than helpful to a customer who requires immediate service. That business owner may not run the best business in the area, but the owner is not guilty of consumer fraud. And if a media report defames a business owner's reputation based on grounds that fall short of conduct that violates the Act, that person need prove only negligence on the part of the media defendant.

## VIII

■ In establishing the applicable burden of proof (actual malice vs. negligence), we direct our analysis to whether an article reports a matter of consumer fraud that amounts to a legitimate public concern. We examine the article in its entirety assuming that all its allegations are true. If, drawing all reasonable and normal inferences, the article reads fairly and describes conduct, activities, and events that would lead an average reader to conclude that the owner engaged in business practices that were unconscionable, deceptive, misleading, and reflected bad faith, then the actual-malice standard would be applicable.

■ However, in drawing the reasonable inferences, we consider the evidence that the plaintiff introduces to show that the article does not set forth consumer fraud conduct that would constitute a violation of the Act. Turf vigorously opposed the motion for summary judgment. There was extensive discovery. Numerous and voluminous depositions, affidavits, supplemental affidavits, and experts' reports, together with tapes and tran-

scripts of tapes, were filed. In determining whether plaintiff has introduced sufficient evidence to show that the article fails to set forth acts of consumer fraud that raise matters of legitimate public concern, the reporter's conduct is irrelevant. Rather, we focus on Turf's actions. Thus, our examination of the record is similar to that undertaken by the Supreme Court in *Time, Inc. v. Firestone*, 424 *U.S.* 448, 96 *S.Ct.* 958, 47 *L.Ed.*2d 154 (1976) (holding actual-malice standard not applicable because a wealthy Palm Beach socialite's involvement in a much-publicized divorce did not make her a public figure) and *Gertz, supra*, 418 *U.S.* at 344–45, 94 *S.Ct.* at 3009, 41 *L.Ed.*2d at 808 (limiting the applicability of the actual-malice standard to "public figures" and "public officials" who had "thrust themselves to the forefront of particular public controversies."), and by this Court in *Sisler, supra*, 104 *N.J.* at 268–70, 516 *A.*2d 1083 (applying actual-malice standard to newspaper article about a former bank president that concerned a matter of legitimate public interest).

## IX

With those principles in mind, we consider whether Turf's actions, as set forth in the article, would constitute an "unlawful practice" under the Act. Generally, conduct of a business that is alleged to be consumer fraud but does not constitute a violation of the Act will not be deemed to raise a matter of legitimate public concern that would trigger use of the actual-malice standard.

To support *The Record*'s allegations, Locklin reported that an investigation of the Better Business Bureau's records produced five complaints against Turf during Gloria's ten-year ownership. Two of those complaints also appeared on the docket in small-claims court. In the article, Locklin quoted Ms. Daglezt, one of the small-claims plaintiffs, as stating "that [a Turf employee] almost had my fist down his throat. He was so nasty." Locklin interviewed, but did not quote, Doris Green, who had also filed a

complaint against Turf in small-claims court. Turf picked up two lawn mowers from her for servicing. She alleges that a Turf employee told her at that time that pick-up and delivery would cost $15. When a Turf employee told her that the second lawn mower was beyond repair, she told him that she wanted it, but a Turf employee explained that it had been disassembled. When Turf delivered the second machine to her at her request, they requested a delivery fee. Because she believed that the machine was still disassembled to some degree and because she "didn't like his attitude," Green, like Daglezt, also sued Turf and Gloria in small-claims court. Both of those complaints were dismissed by the court. We find that neither of those complainants alleged any conduct by Turf that would constitute consumer fraud under the Act.

Locklin also interviewed Ron Broking, a former Turf customer who had complained to the Better Business Bureau. Broking explained to Locklin that Turf had held his lawn mower for weeks, had given him a runaround, and had lied to him, and that after returning to Turf to check on his mower, he had learned that Turf had never touched his mower although the counter person told him that Turf was working on it. Again, while Broking's complaint alleged sloppy business practices, we find that his allegations of Turf's actions would not be sufficient to support a consumer fraud complaint under the Act.

However, the allegations of Mel Clansky, another former Turf customer, who had taken his electric lawn mower to Turf for repair, would support a claim of consumer fraud. Turf charged him $54, and the machine worked "for all of about two minutes and the same thing happened again [machine smoked and jammed up]." Clansky took the mower to Turf again. Turf kept the machine for four weeks and, according to Clansky, gave him a runaround. Turf told him that fixing it would cost $200 and a new machine would cost $125 to $130. Eventually, Clansky bought a new mower from a different shop. When Clansky asked Turf to return his old mower, Turf told him that the mower was in a

different location. Clansky never got his old mower or a refund. He wrote to the Better Business Bureau, which told him that Turf had never responded to prior complaints.

Although Locklin accurately restated in the article his interviews with those who filed Better Business Bureau complaints, all those complaints, except for Clansky's complaint, illustrated only bad employee attitude and discourtesy, sloppy business practices, and poor business judgment. Thus, reliance on such complaints is insufficient to support a claim that Turf violated the Act.

In determining whether an article sets forth matters that would constitute a violation of the Act, courts may consider the various sources for the story. One source for consumer fraud reports might be former employees who could provide useful information about the business practices of their former employers. Nevertheless, if the sole source of an article is a disgruntled, fired employee, or a sole competitor, a court could conclude that that evidence alone would not be sufficient to support an action that a plaintiff's conduct violated the Act.

To support his allegations against Turf of consumer fraud, Locklin interviewed four former employees of Turf. He never disclosed in the article that the former employees had been fired. Locklin's failure to have made it clear in the article that the employees had been fired casts doubt on his use of the former employees' statements to support the article's allegations of Turf's consumer fraud conduct.

Locklin also interviewed one competitor, Edward Mitchell, the owner of Eddie's Power Equipment, and one of his employees. Mitchell told Locklin that at least twenty times each year customers brought their mowers to him after Turf had worked on them. The customers told Mitchell about the repairs that Turf supposedly had made, and after Mitchell examined the mower, he could tell immediately that Turf had not done what it claimed. The employee alleged that during his employment interview, Gloria had told him, "Look, we put a spark plug in, we change the oil, we sharpen the blade, we hope they run. We charge $40, we don't fix em until they bring them back."

Certainly, the statement of one competitor and his mechanic do not support Locklin's broad assertion that "[m]ost customers who paid for tune-ups got little more than an oil change and a new spark plug—for which they typically were overcharged $20 to $30." Thus, those statements alone would not support a claim that Turf's conduct violated the Act. Nevertheless, they do allege typical consumer fraud conduct, and do offer some corroborative evidence that Turf's alleged conduct constituted consumer fraud.

## X

However, Locklin's reporting of Turf's conduct during both the second and third tests is sufficient to support his allegations against Turf of consumer fraud. Such conduct could lead an average reader to conclude that Turf engaged in business practices that were unconscionable, deceptive, misleading, and reflecting bad faith that would constitute a violation of the Act.

In his article, Locklin described in three sentences *The Record*'s second visit to Turf for service. After the first test his assistant, DeMarco, took the same machine back to Turf. This time the spark plug clamp had been disconnected, and DeMarco told the Turf employees that she couldn't get the machine started. Turf kept the machine another three weeks, charged a $20 diagnostic fee, and recommended an unnecessary tuneup. In her notes DeMarco wrote that Locklin had also loosened the on/off switch which prevented the machine from starting. She also wrote that the Turf employee had immediately identified the loosened on/off switch, had informed her of the $20 diagnostic fee, and had advised her to leave the machine so that they could diagnose the problem. After several weeks DeMarco returned to Turf and picked up her lawn mower, which Turf had diagnosed as needing a tune-up and a blade sharpening for $68.49. DeMarco elected not to have the tune-up, paid the $20 diagnostic fee, and left with the mower. When the newly repaired lawn mower was brought in by DeMarco, it was in good working order, except for

the loosened on/off switch and disconnected spark plug. Therefore, Turf's assertion that it needed a tune-up and a blade sharpening appeared to be misleading. Thus, Turf's conduct alleged in connection with the second test would be sufficient evidence of a consumer fraud violation.

Likewise, an average reader could conclude that Turf's conduct alleged in connection with the third test was deceptive and misleading. In comparison to the first two visits, *The Record*'s third visit to Turf was quite different. Using a Bob Cat brand lawn mower, Locklin conducted another loose-spark-plug test in which he visited Turf and eleven other shops. Of the twelve, six shops identified the rigged problem, screwed in the loose part, and charged nothing. The sub-article identified these shops as "winners." Five other shops did not identify the problem immediately and informed Locklin that he would have to leave the rigged lawn mower for a diagnosis or a tune-up. In the sub-article those shops "were judged no verdict tests." In addition, Locklin refused to leave the lawn mower at the other "bad" shops, and received estimates from three of those shops for diagnosis and repair ranging from $35 to $60. One of those three shops was termed "worst of the day" by Locklin in his notes, but was not noted in the article or visited again for tests similar to that conducted at Turf.

The part of the article describing the third test reads:

In the third test, a reporter took a Bobcat mower in good working condition to Turf. Again, the spark plug clamp was pulled loose so the machine wouldn't start. Turf kept the machine four weeks and charged $63 for a tuneup. A Turf mechanic said he rebuilt the carburetor and installed new points. But the mower has a solid-state ignition. It has no points.

After leaving the Bob Cat at Turf, Locklin had picked up the machine four weeks later and paid $63 for a tune-up, which included the rebuilding of the carburetor. Locklin questioned why the mower had not started, and the mechanic told him that because he had had a problem starting it he had rebuilt the carburetor and had put in fresh oil, gas, and new points. Locklin checked with three sources and learned that the Bob Cat mower

had a solid-state ignition with no points. Accordingly, we find that Turf's rebuilding of the carburetor in a mower that apparently was in good condition and the installation of new points in a machine that did not need points, in tandem with the second visit, are sufficient to support a claim that Turf committed consumer fraud under the Act.

## XI

In the context of a summary judgment motion, whether this record establishes that Turf's alleged conduct could support a cause of action for consumer fraud under the Act is a difficult question. Certainly, Turf's alleged conduct was not as "misleading" or so outside the norms of reasonable business practices as the conduct of the business owners in *Levin, supra,* 179 *N.J.Super.* 193, 431 *A.2d* 157 and *Hyland, supra,* 146 *N.J.Super.* at 409, 370 *A.2d* 20. However, Locklin's second and third tests and Clansky's complaint are evidence of conduct that would support a cause of action for consumer fraud under the Act. Moreover, the evidence from Turf's former employees, the five Better Business Bureau complaints, and the statements of Mitchell and his employee all offer some corroborative evidence of misleading business practices on the part of Turf. Additionally, Locklin did attempt to verify his information by contacting Gloria and taking the Bob Cat to at least 6 shops that found the machine did not need repair. Because defendants' article described sufficient uncontradicted assertions of Turf's conduct that, if true, would be sufficient to support a complaint of consumer fraud under the Act, we find Locklin's article is well grounded in consumer fraud. Therefore, we find that actual malice was the appropriate standard for summary judgment.

## XII

We next must consider whether the evidence presented by the plaintiffs for actual malice was sufficient to withstand a motion for summary judgment. To survive a motion for summary

judgment, the plaintiffs must establish by clear and convincing evidence that the defendants published the article either with the knowledge that the statements were false or with reckless disregard of whether they were false. *New York Times, supra,* 376 *U.S.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706. Thus, the plaintiffs have a very heavy burden in establishing that the defendants published an article with actual malice. See *Costello, supra,* 136 *N.J.* at 614–19, 643 *A.*2d 1012 (explaining the application of actual-malice standard and the heavy burden the plaintiffs face in meeting that burden). Because we determine the applicability of the actual-malice standard in the context of defendants' motion for summary judgment, "we view the facts in the light most favorable to the plaintiff, giving [plaintiff] the benefit of all favorable inferences that may legitimately be drawn from the record." *Dairy Stores, supra,* 104 *N.J.* at 135, 516 *A.*2d 220; *accord Kirk v. City of Newark,* 109 *N.J.* 173, 184–85, 536 *A.*2d 229 (1988). Therefore, we accept plaintiffs' experts' criticisms of Locklin and the other *Record* staff members' journalistic methods, and their scathing reviews of the improprieties of *The Record*'s article on Turf.

Professor Hampden H. Smith, III, head of Washington & Lee University's Department of Journalism found the article to be inaccurate and unfair as it "originated in a totally unprofessional way and developed with a completely improper focus on Turf alone." He cited numerous instances in which *The Record* and its staff members had "failed to follow universally accepted journalistic standards in a number of instances in the preparation of the article...." Professor Smith specifically outlined how the "comparison test" developed by Locklin was not a comparison because other shops were not properly investigated more than once, records of complaints and suits against such shops were not sought, and the tape recorder was selectively used and tapes selectively destroyed. Also, Locklin had failed to mention that in a ten-year period of business, only five complaints had been filed against Turf and that all had been resolved in Turf's favor. He quoted only one competitor who had an opinion of Turf's business

practices, that opinion based upon allegations made by the competitor's customers. In addition, Locklin told his "sources" that he was investigating lawn-mower-repair shops, but his investigation was focused exclusively on Turf and Gloria. Professor Smith posited, "[I]t is theoretically possible that every other repair shop in Bergen County was sued more frequently than Turf. By focusing research solely on Turf, Locklin and DeMarco studiously avoided learning how good or bad Turf's court and complaint records were in comparison with other shops." In addition, Professor Smith criticized Locklin's sources: former employees, rather than current employees. He wrote, "The only people sought out were those quite likely to have negative attitudes and negative information." Professor Smith also noted that Locklin had never attempted to identify any source who might be favorable to plaintiffs. Instead, Locklin corroborated his investigation by interviewing approximately ten sources, each of whom he knew had a bias against Gloria and Turf.

Plaintiffs also retained Marilyn Lasher, Ph.D, of Media Analysis & Communications Research. She conducted an extensive review of *The Record*'s consumer-fraud work, the applicable law, as well as the entire judicial record of the case. She concluded that the independent and so-called scientific tests that Locklin had conducted "were devoid of validity, reliability and other requirements of scientific method and experimental design."

Even defendants' own expert, Robert W. Greene, then Assistant Managing Editor of *New York Newsday*, determined that although the tests had been performed in a valid way, they had not been conducted scrupulously. Nevertheless, he concluded that the "readers could decide for themselves . . . what type of conclusions they could draw from the tests."

The record confirms that much of plaintiffs' experts' criticism of the article are justified, particularly their emphasis on the omission of relevant information and reliance on biased sources. To establish actual malice, a plaintiff needs to prove "that the defendant in fact entertained serious doubts about the truth of the

statement or that defendant had a subjective awareness of the story's probable falsity." *Costello, supra,* 136 *N.J.* at 615, 643 *A.*2d 1012 (citing *Schiavone Constr. Co. v. Time, Inc.,* 847 *F.*2d 1069, 1089 (3d Cir.1988)). Although we agree with the trial court that Locklin's "methods may have been negligent or even grossly negligent," we find that plaintiffs have failed to prove that Locklin ever doubted that Turf's conduct constituted serious consumer fraud practices. Plaintiffs, therefore, have failed to establish that Locklin demonstrated actual malice in his reporting.

### XIII

The need for constant accommodation by the judiciary is among the often-conflicting goals of the First Amendment. An important societal value is at issue—a person's reputation. As Justice Stewart stated in his concurrence in *Rosenblatt v. Baer,* "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." 383 *U.S.* 75, 92, 86 *S.Ct.* 669, 679, 15 *L.Ed.*2d 597, 609 (1966).

We do not fail to consider the chilling effect of defamation actions on the media. We recognize, however, that substantial constitutional protections exist for the press, *supra* at 403–404, 655 *A.*2d at 423, and no evidence shows that the free flow of information has been restricted in the overwhelming number of states that have adopted the negligence standard. Therefore, we hold today that the negligence standard is the most appropriate standard to adopt with regard to businesses involved with an everyday product or service, whose practices do not constitute consumer fraud, impinge on the health and safety of New Jersey's citizenry, or comprise activity within a highly-regulated industry.

By this opinion, we do not diminish the strong protection against the threat of defamation actions that the press has in this State. That protection has assured the public of the free, robust,

and uninhibited flow of information on all matters, especially those of public concern. That protection exceeds that imposed by the United States Supreme Court and the vast majority of states (forty-two), *supra* at 403, 406 n. 1, 655 *A.*2d at 423–424. In New Jersey we have imposed the actual-malice standard where the press's statement concerns businesses affecting the public's health and safety and businesses that are subject to substantial government regulation. In recognition of the fact that the public benefits from having the press act as a consumer affairs watchdog, today we take a further step: to protect the public interest and the press, we impose an actual-malice standard rather than a negligence standard, even for ordinary businesses, if the consumer fraud allegations in the article, if true, would constitute a violation of the Consumer Fraud Act.

We do not, however, as suggested by the concurrence, close the door to additional press protection, allowing it only if the Act is violated. Although business practices that fall short of consumer fraud will be subject to press scrutiny even when the press has the protection of only a negligence standard, we recognize there may be occasions when such practices are so damaging to the public as to call for the protection of the press through a malice standard. We are not omniscient and cannot foresee every possible instance when that additional protection for the press would be required in the public interest. Our decision announces a general rule that when the conduct alleged would constitute a cause of action under the Consumer Fraud Act, the actual-malice standard applies.

We recognize the enormous difficulties imposed on plaintiffs seeking to establish actual malice on the part of the press. *Costello, supra,* 136 *N.J.* at 615, 643 *A.*2d 1012. Not only the reputation of many businesses, but also the businesses themselves may be destroyed by the publication of an article. Gloria contends that as a direct result of the false and defamatory statements published by *The Record,* he subsequently filed for bankruptcy. Like the trial court, we conclude that "[v]iewed from the perspective of the justice system plaintiff did not get a fair trial before the

verdict of Locklin was published in *The Record.*" Nevertheless, the importance of the free flow of information to the public about consumer fraud, and the vital role that investigative reporting plays in conveying that information to consumers justifies the imposition of the actual-malice standard to disclosures by the press that substantially concern allegations of consumer fraud.

## XIV

We affirm the judgment of the Appellate Division and the trial court's order granting defendants' summary judgment for the reasons expressed in this opinion.

POLLOCK, J., concurring.

I agree with the majority that the Bergen Record did not publish either with knowledge that the facts in the subject articles were false or with reckless disregard for the truth or falsity of those facts. Like the majority, therefore, I would affirm the summary judgment for defendants. Unlike the majority, however, I would stop at that point. Beyond that, the majority opinion points in too many directions for me to follow it unquestioningly.

The tenor of the majority opinion is that the media act in the public interest when writing about conduct that violates the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –60 (the Act). At the outset, however, the majority states that whether conduct constitutes consumer fraud depends not necessarily, "but *generally* on whether the alleged activities of the business would constitute a cause of action under the Consumer Fraud Act." *Ante* at 416, 655 *A.*2d at 429 (emphasis added).

That ambivalence engenders internal inconsistencies in the majority opinion. For example, the majority finds that the public interest does not encompass articles about overcharging, *ante* at 416, 655 *A.*2d at 429, and inferior service, *ante* at 417, 655 *A.*2d at 430. Yet, it would include "business practices that were unconscionable, deceptive, misleading, and reflecting bad faith...."

*Ante* at 417, 655 *A.*2d at 430. Overcharging, like inferior service, can be unconscionable, deceptive, misleading, and reflect bad faith.

Fairly read, the majority opinion stands for the proposition that a violation of the Act illustrates, but does not restrict, the terms "public concern" and "public interest." To the extent that the majority recognizes that the Act does not constitute the universe of public concern, I agree.

I believe that the media perform a valuable service both when writing about matters that the Legislature finds contrary to the public interest and in bringing such matters to the attention of the Legislature and the public. Hence, I doubt that the media can discharge that function if they are confined to a legislative definition of the public interest. My concern is that after today, notwithstanding the majority's protests to the contrary, reporting on matters in the public interest will be less "uninhibited, robust, and wide open." *Ante* at 408, 655 *A.*2d at 425.

Furthermore, I would temper the majority's concern for the vulnerability of repair people, *ante* at 417, 655 *A.*2d at 430, with some concern for the vulnerability of consumers. For me, the analogy of repair people to the "local 'mom and pop' stationery store, shoemaker, tailor, cleaner, or barber" does not work. *Ante* at 412, 655 *A.*2d at 427. Anyone who needs a repair person, unlike someone buying a newspaper or leaving a suit at the dry cleaners, is generally vulnerable. The motorist whose car breaks down on the highway is vulnerable to the demands of the tow truck operator and the service station. The individual with a broken washing machine does not enjoy equal bargaining power with the appliance repair person. And the homeowner with a broken lawn mower is open to exploitation.

Unlike the majority, I would characterize as in the public interest articles about businesses that exploit vulnerable consumers. I prefer to join those courts that find in the public interest exposure of unfair or dishonest business practices of repair shops. *See Unelko Corp. v. Rooney,* 912 *F.*2d 1049, 1056 (9th Cir.1990),

*cert. denied,* 499 *U.S.* 961, 111 *S.Ct.* 1586, 113 *L.Ed.*2d 650 (1991) (holding that comments about consumer product's effectiveness involve matter of public concern); *Diversified Management Inc. v. Denver Post, Inc.,* 653 *P.*2d 1103, 1108 (Colo.1982) (holding that activities of real estate developer engaged in sales to public are matter of public concern). In reaching this conclusion, I recognize that most repair people are honest and competent. Some are not. Rooting out exploitive and incompetent repair shops is in the interests of both honest repair people and the public.

Although mindful of the risk of biased reporting, I remain persuaded that the media serve the public interest in exposing consumer exploitation. For a decade, this Court has protected speech that "affects the health and safety of the citizenry, or involves a highly regulated industry." *Ante* at 409, 655 *A.*2d at 426. Also entitled to protection is speech about businesses that exploit consumers, even if those businesses have not violated the Act.

Finally, I would be less than faithful to our precedents if I did not express regret about the majority's excessive reliance on federal cases and their reliance on the concept of "actual malice." If only the Court would look to its own decisions it could solve the present problem without resort to constitutional principles. I continue to believe that

> we lose nothing by striking "malice" from the vocabulary of the common law of defamation. Indeed, the *Restatement* eschews the term altogether, speaking instead of the "abuse of privilege." It is more direct to recognize the legal consequences of the publication of certain statements without recourse to so ambiguous a word with such a checkered past. For example we need not resort to the term "malice" to state that no one has a license to lie. Although we discard the label, we adhere to the principle that to overcome a qualified or conditional privilege, a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity. With or without the term, the critical determination is whether, on balance, the public interest in obtaining information outweighs the individual's right to protect his or her reputation.
>
> [*Dairy Stores, Inc. v. Sentinel Pub. Co.,* 104 *N.J.* 125, 151, 516 *A.*2d 220 (1986) (citations omitted).]

I would affirm the judgment of the Appellate Division.

Justice O'HERN, joins this opinion.

Justices POLLOCK and O'HERN concurring in result.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.