693 A.2d 546

KEVIN MACKAY AND CORVETTE REPAIR, INC., PLAINTIFFS–APPELLANTS, v. CSK PUBLISHING CO., INC. D/B/A VETTE MAGAZINE, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted April 22, 1997—Decided May 20, 1997.

Before Judges MICHELS, KLEINER and COBURN.

*Law Office of Bruce A. Blakeman,* attorney for appellants (*Todd C. Rubenstein* and *Bradley A. Blakeman,* on the brief).

The *Law Firm of Michael Levine, P.C.*, attorney for respondent.

The opinion of the court was delivered by

KLEINER, J.A.D.

In this defamation case, defendant published an article that alleged that plaintiff participated in some fraudulent business dealings in his repair and restoration of a Corvette. The trial judge found that plaintiff was a limited purpose public figure in the Corvette restoration community and for the purposes of the fraudulent restoration debate. After a five-day trial, a jury found that the article was about plaintiff, that the article was false, but that the article was published without actual malice. Thus, plaintiff had no cause for action.

On appeal, plaintiff raises the following points of error:

*POINT I*

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN PREVENTING PLAINTIFF HIS CONSTITUTIONAL RIGHT TO SIT AT COUNSEL'S TABLE AND ASSIST COUNSEL IN PROSECUTION OF PLAINTIFF'S CLAIMS.

*POINT II*

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN RULING PLAINTIFF TO BE A LIMITED USE PUBLIC FIGURE.

*POINT III*

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO FIND THE SUBJECT ARTICLE DEFAMATORY AS A MATTER OF LAW.

*POINT IV*

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO STRIKE DEFENDANT'S DEFENSE OF TRUTH FROM THE CASE.

*POINT V*

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN PERMITTING DEFENDANT TO INTRODUCE, FOR IMPEACHMENT PURPOSES, EVIDENCE OF ARRESTS OF PLAINTIFF KEVIN MACKAY AND EVIDENCE OF UNRELATED CIVIL LITIGATIONS INVOLVING PLAINTIFF KEVIN MACKAY.

We find that the trial judge did not err in holding that plaintiff was a limited purpose public figure. As to plaintiff's other claims,

after a thorough review of the record, in light of applicable law, we find that they are clearly without merit. *R.* 2:11–3(e)(1)(E).

## I

Plaintiffs, Kevin MacKay and Corvette Repair, Inc., filed a complaint against defendant, CSK Publishing, Inc. d/b/a Vette Magazine on February 1, 1993, alleging defamation. Defendant filed an answer on June 2, 1993.[1]

A jury trial was held between August 5, 1996, and August 13, 1996. The jury determined that plaintiff was not entitled to damages, and a judgment of no cause for action was entered on August 13, 1996.

## A.

### *THE ARTICLE*

The following article appeared in the December 1992 issue of *Vette* Magazine:

#### *Factory Fresh*

##### *Avoid being a restoration victim*

##### Richard Prince

In a recent COLLECTING column, Jerry Heasley discussed an ongoing attempt by some unscrupulous characters to sell a bogus 1967 L89 roadster. Mr. Heasley concluded with the assertion that with some intelligent research, a potential buyer is able to protect himself from fraud. Both Mr. Heasley and VETTE are to be commended for bringing this situation to a public forum.

I believe, however, that research by itself will not always provide the needed protection. and that the seriousness of the subject matter entitles it to further discussion.

I have a friend named Bob Graff (that, by the way is his real name; we are compelled to change only the names of the guilty!). Bob is fun, witty, charming and an all-around excellent guy. Two years ago, Bob bought a 1959 Corvette. He

---

[1] For ease of description, "plaintiff" refers to Kevin MacKay and "defendant" refers to *Vette* Magazine.

had no knowledge of what parts of his car were original or "correct." To Bob, the car looked unmolested, and was in good operating condition. But it needed some work and, as Bob's children (he is a wonderfully generous father!) would on occasion be driving the car, Bob was particularly interested in making sure that it was entirely safe and reliable.

To that end, he took reasonable and intelligent steps to find a qualified technician to repair and service his Corvette. He asked around among some car people he knew and was told to go to a particular restorer who I will call Biff. (Biff's real name is not Biff. The name is changed because my intention here is not to expose the criminal behavior of a specific individual. Rather, I am relating a true story in order to illustrate why I believe that certain systemic changes should be implemented.) Biff presented his credentials and Bob was thoroughly impressed. Biff is a Bloomington Gold judge, an NCRS judge and has been written up in numerous magazine articles touting him as the "restorer of the decade."

Biff told Bob that, among other things, the engine was a bad restamp and the transmission was incorrect, but with his connections and talent he could procure for Bob a factory-original block, all correct engine compartment components and a correct transmission.

Approximately $15,000 later, Biff provided Bob with an incorrectly restamped engine (the stamping reads "F0414CT"—but an original 1959 Corvette engine should read "F414CT") and an incorrect transmission (even though the main case is dated 1963, the side cover is dated 1966 and the tail is dated 1977, Biff argued that it is "correct." because it is a T–10 and 1959 Corvettes came with T–10s).

The real tragic aspect of Bob Graff's story, however, is not the bogus engine, the incorrect transmission, the frame damage (Biff sold Bob a "correct" fuel pump, and then heated up and hammered in the chassis to provide adequate clearance for it) or the host of other incorrect parts that Biff sold to Bob. It is not even the money wasted. The real tragedy, dear readers, is the fact that Bob Graff's 1959 Corvette actually had its original engine in it when it was delivered into Biff's hands.

After the damage was already done, Bob accidentally discovered a forgotten appraisal that was done for the '59 when he first purchased it. The appraiser, in addition to noting that the car was extremely original, recorded the car's engine numbers in the appraisal report. These recorded numbers correspond to the car's original engine.

In addition to the pre-Biff appraisal, further confirmation that the car had its factory engine came when Bob Graff located every previous owner of the car, including the very first purchaser. Each of the previous owners clearly remembered that the car had its original engine in it when they bought it and when they sold it.

Unfortunately, Bob Graff's experience is not unusual. Bob asked the right questions among collectible car people he knew. He was directed to Biff, a well-known Corvette mechanic. Bob asked Biff the logical and intelligent questions. Biff presented his credentials and Bob was convinced that he had found the right man for the job. Bob did some research and made the right moves, but unlike the prospective purchaser of the aforementioned bogus L89, he wound up victimized.

What, then, is the solution? Well, in the end, no matter what any or all of us do, there will always be victims. This is an inevitable result of the sizable sums of money involved in the collector car hobby. As long as there is money at stake, there will be thievery.

What we can do, however, is to take reasonable steps to minimize the opportunities for dishonest behavior. It is especially important that those whom I call the "power brokers" do what is necessary to stop unscrupulous behavior that they are aware of.

The "power brokers" are those individuals who exert an influence over the Corvette world that is disproportionate to their numbers. They are the people who run the large organizations and the major shows. They are the people who write for the magazines and the people who orchestrate the editorial content of the magazines. Virtually all these people have derived significant benefits as a result of their association with the Corvette hobby.

These "power brokers" have a responsibility to all of us to do whatever is in their power to to [sic] keep our hobby as free from vermin as possible. If they know that a particular individual is engaging in unethical or illegal behavior, they owe it to Corvette owners everywhere to do what they can to stop that person. The Biffs of the world should not be permitted to abuse the privileges of membership in our organizations and write-ups in our magazines in their ongoing effort to fleece everyone who walks through their doors.

It is undisputed that the "Biff" in the article is, in fact, plaintiff, Kevin Mackay.

This article was written in response to an article, also in *Vette* Magazine, written by Jerry Heasley, that discussed ways to avoid being "victimized" when buying Corvettes. This was, apparently, a big issue among Corvette collectors and restorers. As will be discussed *infra*, plaintiff himself wrote an article on a related topic.

### B.

### BACKGROUND

The following facts were elicited from plaintiff, Kevin Mackay, on direct examination. Plaintiff restores Corvette automobiles. He owns and operates Corvette Repair, Inc., a New York corporation located on Long Island. Corvette Repair, Inc. is in the business of "repairing and servicing, troubleshooting Corvettes and restoration work." Plaintiff is a member of many Corvette

enthusiast groups, including the Glass Society Corvette Club and the National Corvette Restorers Society (NCRS).

Additionally, plaintiff has been a judge for many years for various Corvette restoration competitions, including the NCRS competition and the Bloomington Gold competition. Plaintiff has traveled around the country to judge Corvette restoration shows. These shows judge a car for the "highest quality restoration ... everything is originality and condition." The cars that are entered into these shows are not usually driven on streets because such treatment would damage their "show value." Plaintiff restores Corvettes for enthusiasts who wish to enter their cars into these big shows and into smaller events as well.

One of the cars that plaintiff restored was referred to in *Corvette World* magazine as the "restoration of the decade." The article was accompanied by a front-page picture of the automobile and an article for which plaintiff was interviewed. Plaintiff also once wrote a technical column for *Corvette World* magazine for several years and later wrote technical articles for *Corvette Fever* magazine, both of which are competitors of defendant. In total, plaintiff estimated that he has written in excess of fifty articles. One of the articles that plaintiff wrote was entitled, "How to Buy a Corvette: The Numbers Game—When it Comes to Engine Stampings, What You See Isn't Necessarily What You Get." The article describes in detail fraudulent practices used by unscrupulous dealers to defraud unsuspecting clients.[2]

Plaintiff has also won nearly 200 awards and certificates for his restoration jobs and has some of his cars displayed at various museums. Plaintiff estimates that he is one of the top two Corvette restorers on the East coast.

One of plaintiff's competitors on Long Island is a company called Real Cars, Inc., owned and operated by Richard Prince, the author of the subject article. Plaintiff testified that he was never

---

[2] Unfortunately, this article is not in the record although it was discussed at trial and was admitted into evidence at trial.

contacted by defendant prior to the publication of the subject article.

According to plaintiff, Robert Graff came to him in the fall of 1989 in order for plaintiff to do a partial restoration on his 1959 Corvette, which had been "running rough." Graff, according to plaintiff, wanted the car to run smoothly and was not interested in restoring his car to the degree that it could be entered into a competition where originality and condition would be relevant. "[H]is intention was to drive the car on occasion, over the weekends, you know, when he was away from work, to go to a friend's house, or go to a rally of some type. That was his main thing, to have fun with the car, not to really show it." Graff was interested in his Corvette being "very dependable for the road."

Plaintiff testified that the engine in Graff's car was "very, very worn and tired." Besides doing engine work on the car, plaintiff also replaced the transmission and changed one of the leaf springs, which was cracked. At the time that he did the work on Graff's car, the car did not have its original engine. "The engine block was dated 1961. The Corvette is a 1959." The engine's date is determined by a "casting date which is in back of the block." Also, there are "casting numbers," which are numbers that correspond to a particular part, and also to particular years. There is also an "assembly date which would be on the front of the engine pad."

After determining that Graff's car contained the wrong engine, plaintiff searched for the correct block type and ultimately located one from a "gentleman in Wisconsin who specializes in old Chevrolet engines." After receiving the correct block, plaintiff sent it to a machine shop to rebuild it. "Once it was rebuilt then we installed in back in Mr. Graff's car."

In a file that he kept in the ordinary course of business, plaintiff took the following notes about Graff's car. With regard to the original engine, plaintiff wrote "F515CU," which was the assembly date of the engine. He testified:

F means that the engine was manufactured in Flint, Michigan, that's where they made the engine. The engine was assembled on 515 which meant this is May 15th of 1959[sic] when the engine was actually assembled at the factory. And CU would be the code of the engine. It would be different grades of horse power.

Plaintiff also wrote down "A–17–1." This was the date on the back of the block and corresponds to January 17, 1961. The part number on the block was "375619," a block that was used "from mid–1958 to 1961." Plaintiff testified that it would be impossible to have a 1961 block in a 1959 Corvette unless it was "put in after the fact."

Regarding the replacement engine, plaintiff took the following notes. The code, "F0414CT," referred to Flint, Michigan, April 14, and CT is a lower horse power engine for safer "street driving." The date on the back of the block was "C–11–9," which stands for March 11, 1959. Plaintiff testified that sometimes stampings were done incorrectly at the plant at which the engine was manufactured. Plaintiff also testified that Graff's car was not show quality; it was simply a "nice driving car."

Plaintiff examined a 1988 appraisal of Graff's car that was prepared by a Corvette appraiser, Alan Blay. Plaintiff found many discrepancies between the appraisal and his personal knowledge about the car. Plaintiff testified that the appraisal incorrectly stated that the car had its original engine. Plaintiff also disagreed with several other aspects of the 1988 appraisal. For example, plaintiff disagreed with the notation on the appraisal that indicates that the car had a hardtop. According to plaintiff, the subject car never had a hardtop because there would have been additional mounting holes for a hardtop. According to plaintiff, the 1988 appraisal indicated that the car was in much better shape than it really was.

## C.

Plaintiff testified that a year and a half after he restored Graff's car, Graff informed him that there was allegedly an error on the front of the engine pad. The error was that the engine should

have been stamped "F414CT" not "F0414CT." According to plaintiff, the misstamp "could have been a factory error." While such an error might have devalued a car for a competition such as the Bloomington Gold, it would not make the engine incorrect. Plaintiff testified that the engine came that way from the engine dealer in Wisconsin.

Plaintiff testified that engine restamping is a common industry practice so that at a show, the engine block has the correct numbers on it. When Graff pointed out the error to plaintiff, plaintiff offered to correct the problem. According to plaintiff, the stamp on the engine was not a "bad restamp," and plaintiff did not, himself, restamp the engine.

Plaintiff also testified that Graff's car did not have the correct transmission in it when plaintiff first saw the car. Additionally, plaintiff testified that Graff's car had frame damage when it was initially brought into his shop. He claimed that the car had been altered to accommodate a larger fuel pump. Plaintiff claimed that he provided Graff with a correct replacement fuel pump.

### D.

On cross examination, plaintiff admitted that he had been convicted of third-degree attempted forgery in New York in 1978. The evidence was admitted with regard to plaintiff's credibility. Plaintiff's counsel objected to the use of the conviction on remoteness grounds and because the prejudicial effect would outweigh the probative value.

Defense counsel started this line of questioning by pointing out that at a prior deposition plaintiff had claimed that he had never been arrested when, in fact, plaintiff had been convicted of attempted forgery in 1978 and had been arrested on another occasion in Chicago. The evidence was used to assail plaintiff's credibility.

## E.

Before trial, plaintiff's counsel objected to the physical layout of the courtroom. Counsel wanted plaintiff to be able to sit at counsel table with him. The judge responded:

> He is not going—if he sits there, there is not six inches between him and counsel for the defendant. Counsel for the defense can't even make a note on his pad without it being observed, all right? We just don't have the facilities to do it. Your client is less than three feet away from you. There's no big deal....

The judge also made it clear that counsel would not, in any way, be precluded from conferring with his client.

The trial continued for five days. Plaintiff put on five witnesses, customers and friends, who testified that plaintiff was honest and knew how to repair Corvettes very well.

Defendant then called as a primary witness Mr. Prince, the author of the subject article, who testified that the article was based on his interactions with Graff, his review of the 1988 appraisal, and his extensive knowledge of Corvette repair and restoration. The defense also called Alan Blay, the person who had written 1988 appraisal, whose testimony supported the conclusions that he had reached in 1988.

Near the conclusion of trial, the trial judge ruled that plaintiff was a limited use public figure. The judge stated that for "limited purposes Mr. Mackay is a public figure within the Corvette Community." Additionally, the judge ruled that "the statements in the article attribute defamatory conduct to whoever they're talking about."

The judge's jury charge contained the following instructions:

> The article in question which was published by CSK in December 19th, '92 edition of its—*Vette* Magazine. It is conceded by the author to contain descriptions of conduct which would constitute "consumer fraud" and would, therefore, defame the reputation, good will, and competence felt toward the actor. We accept that as given.
>
> ....
>
> We're going to ask you to make your determinations by answering some questions on this jury verdict form. The first question is, "Were the statements in the *Vette* article read and understood by others to be about the plaintiff?" The

first element of his claim that Mr. Mackay must prove is that the defamatory statements were read and understood by third persons to concern the plaintiff. . . .

. . . .

Now I'm not suggesting anything, but assuming you answer the question yes, then you must go on to Question No. 2. "Were the statements contained in the December 1992 article false in fact?" The second allegation that the plaintiff must prove by clear and convincing evidence is that the defamatory statements were false. Mr. Mackay contends that the defamatory statements made in the *Vette* article and concerning him are false. . . .

. . . .

Assuming, but not suggesting it, that your question—the answer is yes, then you must go on to the third question. "Did CSK publish this article with actual malice toward Mr. Mackay?" That is intentionally and deliberately and with actual knowledge of its falsity or with reckless disregard for the truth.

The jury answered the first two questions in the affirmative and the last question in the negative. That is, the jury found that the article was about plaintiff and was false but that it was not published with actual malice.

## II

In plaintiff's first point, he argues that his not being able to sit at counsel's table was reversible error because plaintiff was unable to "actively assist in the prosecution of his claims against defendant." Plaintiff argues that his specialized knowledge in the area of Corvette repair made him a necessary "trial aide."

Plaintiff offers no legal support for his claim that sitting directly behind his counsel, "within three feet," deprived him of any constitutional right. This is simply a matter of resources. In an ideal world there would be no courtrooms that have space limitations, this is not, however, a perfect world. Plaintiff's position on this issue would mandate the closing of courthouses all throughout the state. This claim is clearly without merit. *R.* 2:11–3(e)(1)(E).

## III

The issue of whether a person is a public figure or private figure for the purposes of a defamation case is a matter of law and should be decided by the trial judge. *See Lawrence v.*

*Bauer Publ'g & Printing Ltd.*, 89 *N.J.* 451, 462, 446 *A.*2d 469, *cert. denied*, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L. Ed.*2d 395 (1982).

In the landmark case, *New York Times Co. v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L. Ed.*2d 686 (1964), the United States Supreme Court held that in order to prevail in a defamation case, a plaintiff who is a "public official" must show that the subject article was published with "actual malice." *Id.* at 279–80, 84 *S.Ct.* at 725–26, 11 *L.Ed.*2d at 706.

The Supreme Court extended the actual malice standard to apply to articles about any "public figure." *See Curtis Publ'g Co. v. Butts*, 388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed.*2d 1094 (1967). The Supreme Court then held that the actual malice standard applied in situations where the plaintiff is a private figure but the allegedly defamatory statement relates to matters of "public or general interest." *Rosenbloom v. Metromedia, Inc.*, 403 *U.S.* 29, 44, 91 *S.Ct.* 1811, 1820, 29 *L.Ed.*2d 296, 312 (1971).

Later, however, in *Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789 (1974), the Court changed tracks and determined that private figures would not, in the ordinary case, have to prove actual malice. Instead, the *Gertz* Court recognized the category of "limited use" public figures:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.
>
> [*Id.* at 351, 94 *S.Ct.* at 3013, 41 *L.Ed.*2d at 812.]

The Court went on to state, "[i]t is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 *S.Ct.* at 3013, 41 *L.Ed.*2d at 812. The Court examined whether the plaintiff in *Gertz* "thrust himself into the vortex of this public issue," or "engage[d] the public's attention in an attempt to influence its outcome." *Ibid.*

Our Supreme Court acknowledged this class of limited purpose public figures in *Lawrence, supra.* The Court stated:

> Important factors that led the Court to conclude that the *Gertz* plaintiff was not a public figure included plaintiff's lack of any calculated relationship with the press and the fact that he neither "thrust himself into the vortex of this public issue, nor [engaged] the public's attention in an attempt to influence its outcome."

[89 *N.J.* at 463, 446 *A*.2d 469.]

Here, the judge found that plaintiff was a limited purpose public figure for the purpose of the issue of Corvette restoration fraud. Plaintiff had published an article on the topic, thus thrusting himself into the vortex of the debate.[3] In the same article, plaintiff urged a specific solution to the problem of fraudulent stamping of auto parts in an attempt to influence the outcome of the debate. Another factor that supports the judge's decision is that plaintiff has meaningful access to the channels of communication because he has written columns in various Corvette magazines. Additionally, plaintiff is a well-known, prize-winning Corvette restorer who judges Corvette restoration shows. In short, there was sufficient, credible evidence to support the judge's finding that plaintiff was a limited use public figure.

■ Defendant offers another argument to bolster the claim that the actual malice standard was correctly applied even if plaintiff is not a limited use public figure. The argument is based on New Jersey case law, in particular, *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 *N.J.* 392, 655 *A*.2d 417 (1995), *cert. denied*, —— *U.S.* ——, 116 *S.Ct.* 752, 133 *L.Ed.*2d 700 (1996). New Jersey case law has continued to recognize the reasoning in *Rosenbloom, supra*, under which the actual malice standard applies for private plaintiffs where the allegedly defamatory article relates to a legitimate concern of the public. *See Sisler v. Gannett Co.*, 104 *N.J.* 256, 266, 516 *A*.2d 1083 (1986); *Dairy Stores, Inc. v.*

---

3 Plaintiff asserted that, although his name appeared on the byline, he was, in fact, just interviewed for the article. We find this to be irrelevant.

*Sentinel Publ'g Co., Inc.,* 104 *N.J.* 125, 135–36, 516 *A.*2d 220 (1986).

In *Turf, supra,* the Court stated:

> Both *Dairy Stores* and *Sisler* involved business activities that intrinsically implicated important public interests, a matter of public health—the sale of such an essential of life as bottled water—and an industry heavily regulated by the government—banks. We continue to apply the actual-malice standard to businesses that are of such inherent public concern. However, we do not find the actual-malice standard appropriate or necessary with regard to businesses like the sale and repair of lawn mowers, the repair of shoes, the cleaning of clothes, and numerous other local businesses that involve everyday products or services that do not intrinsically involve a legitimate public interest.
>
> [139 *N.J.* at 411–12, 655 *A.*2d 417.]

Thus, under this formulation, the restoration of Corvettes would probably fall into the latter category, that is, a service that does not "intrinsically involve a legitimate public interest."

The *Turf* Court went on to state:

> The public does, however, have a legitimate interest in any business charged with criminal fraud, a substantial regulatory violation, or consumer fraud that raises a matter of legitimate public concern. When the media addresses those issues of legitimate and compelling public concern, the actual-malice standard of proof will apply, regardless of the type of business involved. In so ruling, we seek a balance between a private person's right of privacy and the public's right to know of various dangers in our society.
>
> [*Id.* at 413, 655 *A.*2d 417.]

The Court went on to hold that the plaintiff's acts that were alleged in the subject article, if true, amounted to consumer fraud. *Id.* at 421, 655 *A.*2d 417. Thus, the actual-malice standard applied. *Id.* at 423, 655 *A.*2d 417.

The test articulated in *Turf* is whether the alleged acts, if true, would constitute a violation of the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –48. If so, the actual malice test applies.

In the present case, the subject article, if true, would support a claim of consumer fraud. The alleged acts include Biff telling Graff that the original engine in the Corvette was a "bad restamp," when, according to the article, it was, in fact, the original 1959 engine. The article also alleges that Biff replaced Graff's engine with a fraudulently misstamped, incorrect engine. If taken

as true, Biff has committed consumer fraud by lying about the engine and then replacing the engine and transmission with the wrong parts and damaging the Corvette's frame.

New Jersey's Consumer Fraud Act makes the following illegal:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled. . . .

[*N.J.S.A.* 56:8–2.]

Under this statute, Biff's misrepresentations to Graff in selling him a new engine and telling him that his previous engine was a bad restamp qualify as consumer fraud.

Thus, even if it was error to hold that plaintiff was a limited use public figure, which it was not, it would be harmless error because the actual malice standard was proper under the *Turf, supra,* reasoning as well.

### IV

█ Plaintiff's third argument is that the trial court committed reversible error in "refusing to find the subject article defamatory as a matter of law." This argument is clearly without merit. *R.* 2:11–3(e)(1)(E). The judge did, in fact, find the subject article defamatory as a matter of law. The judge ruled that "the statements in the article attribute defamatory conduct to whoever they're talking about." Additionally, the structure of the judge's charge makes it clear that there defamatory conduct was presumed, thus, that the article was defamatory *per se.*

█ The four recognized categories of slander or libel *per se* are:

[s]tatements that impute (1) commission of a crime, (2) contraction of a loathsome disease, (3) occupational incompetence or misconduct, and (4) unchastity of a woman.

[*Ward v. Zelikovsky,* 136 *N.J.* 516, 526, 643 *A.*2d 972 (1994).]

Clearly, "Biff's" actions would be libelous under category one or three. This only means, however, that special damages do not have to be proven. *Id.* at 540–41, 643 *A.*2d 972.

## V

Plaintiff's fourth point of error has no merit. *R.* 2:11–3(e)(1)(E). Truth is always a defense in libel cases. We note further that the jury found that the article was, in fact, false, and the jury did not believe defendant's truth defense. Thus, any error in this regard, noting again that we detect none, was absolutely harmless.

## VI

Plaintiff's fifth point is that the trial judge committed error in admitting evidence of plaintiff's prior arrests, a prior conviction, and "unrelated civil litigations."

Plaintiff argues that the admission of this evidence was reversible error. There are several problems with plaintiff's claims.

First of all, *N.J.R.E.* 609 reads as follows:

> For the purpose of affecting the credibility of any witness, the witness' conviction of a crime shall be admitted unless excluded by the judge as remote or for other causes. Such conviction may be proved by examination, production of the record thereof, or by competent evidence.
>
> [*Ibid.*]

The decision to allow such evidence "rests within the sound discretion of the trial judge" and will not be reversed unless the trial judge abused his discretion. *See State v. Hutson,* 211 *N.J.Super.* 49, 53, 510 *A.*2d 706 (App.Div.1986), *aff'd,* 107 *N.J.* 222, 526 *A.*2d 687 (1987). Here, plaintiff has not given any reasons why the admission of this conviction was an abuse of discretion.

Second, the evidence was admitted to contradict a statement that plaintiff made in a deposition, namely that he had never been arrested. This use of the prior arrest is even less troublesome than the perfectly acceptable reason stated above.

618

 Third, the jury found that the article was false. Plaintiff's credibility only went to whether the subject article was true or false. The jury agreed with plaintiff that the article's allegations were incorrect. The jury further found, however, that *Vette* magazine did not publish the article with actual malice. Thus, the introduction of this evidence, if error, was absolutely harmless.

Affirmed.